# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION


**CATHY L. BAKER,**

      **Plaintiff,**

                                      **Civil Action 2:17-cv-784**

    **v.**                            **Judge George C. Smith**

                                      **Chief Magistrate Judge Elizabeth P. Deavers**


**COMMISSIONER OF**
**SOCIAL SECURITY,**

      **Defendant.**


### REPORT AND RECOMMENDATION

Plaintiff, Cathy L. Baker, brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for social security disability insurance benefits. This matter is before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 7), the Commissioner's Memorandum in Opposition (ECF No. 12), Plaintiff's Reply (ECF No. 13), and the administrative record (ECF No. 5). For the reasons that follow, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

# I.    BACKGROUND

Plaintiff filed her application for benefits in March 2014, alleging that she has been disabled since April 1, 2011, due to chronic pain, depression, migraines.  (R. at 157-58, 180.) Plaintiff's application was denied initially and upon reconsideration.  Plaintiff sought a *de novo* hearing before an administrative law judge.  Following a hearing on January 5, 2017, Administrative Law Judge George A. Mills III ("ALJ") issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act from April 1, 2011 through December 31, 2014, the date last insured.  (R. at 12-23.)  This decision became the final decision of the Commissioner when the Appeals Council denied review on July 5, 2017.  (R. at 1-6.) Plaintiff then timely commenced the instant action.

# II.    HEARING TESTIMONY

## A.    Plaintiff's Testimony

Plaintiff testified at the administrative hearing that she lived with her husband and teenage child during the period at issue.  (R. at 44.)  She limited her driving because sitting in one spot in the car increased her pain and her legs would go numb.  (R. at 45.)  Driving in the winter "unnerves" her.  (*Id.*)  Her husband drove her to the hearing.  (*Id.*)

Plaintiff acknowledged her problems started following a car accident in 2004.  (R. at 52-53.)  She testified that her pain began with her left leg, but has started in her right leg as well. Plaintiff added that her left leg pain is her most severe pain, although her right leg is "getting there."  (R. at 53.)  Plaintiff took Percocet for pain, Imitrex for headaches, and Cymbalta and Lyrica for burning and tingling of her legs and fingers.  (*Id.*)  Plaintiff testified that she sustained

a concussion from the accident and lost consciousness. (*Id.*) She has no memory of the accident. (*Id.*)

When asked about her pain, Plaintiff described the "worst" is her left leg, but she also described constant pain, with burning, and tingling in the legs; pain in the neck, arms, shoulder, back, and gluteal areas; headaches; and depression. (R. at 55-57.) She has undergone epidural injections and physical therapy without benefit. (R. at 56-57.)

Her migraines occur one to two times per week and last for the entire day. (R. at 60.) When a migraine occurs, Plaintiff takes an Imitrex and lies down, which often results in her falling asleep. (R. at 61.) She described experiencing drowsiness as a side-effect from her medications. (R. at 57, 61.)

Plaintiff estimated she can walk for approximately 5 to10 minutes on level ground and can lift and carry a maximum of five pounds. (R. at 56-57.) She can sit for short periods of time before her symptoms increase, and she can stand for approximately five minutes before needing to change positions. (R. at 57-58, 61.) She can bend forward but not without pain. (R. at 57.)

As to her daily activities, Plaintiff testified that can take care of personal hygiene. (R. at 59.) She does not prepare meals and instead eats food that needs no preparation, such as fruit and yogurt. (R. at 59.) She watches television but sometimes she cannot focus or concentrate on the content. (R. at 59, 63.) Plaintiff sleeps poorly at night due to pain. (R. at 63.) She "rarely" does housework because activities such as sweeping increase her pain and her husband often assists her. (R. at 59-60, 62.) She does do the laundry. (R. at 59-60.) She does not grocery

shop alone.  (R. at 59-60.)  When shopping, she leans on the cart for support and attempts to keep the trips brief.  (R. at 62-63.)

**B.     Vocational Expert Testimony**

Linda Dezack, testified as the vocational expert ("VE") at the administrative hearing.  (R. at 64-68.)  The VE classified Plaintiff's past relevant work as a wax pattern assembler, classified as a medium, unskilled position, which the VE clarified as "light as actually performed based upon review, medium as actually performed based on testimony."  (R at 64-65.)  The ALJ proposed a hypothetical regarding Plaintiff's residual functional capacity ("RFC") to the VE.  (R. at 65.)  Based on Plaintiff's age, education, and work experience and the RFC ultimately determined by the ALJ, the VE testified that "the individual would be capable of performing the wax pattern assembler as actually performed based upon review but not as customarily nor as actually performed based upon testimony."  (*Id.*)  The VE also testified that Plaintiff could perform other jobs such as a ware cleaner, with 29,320 national jobs and 2,670 regional jobs; a waitress, with 2,009,980 national jobs and 247,250 regional jobs; and a cashier/checker, with 3,424,200 national jobs and 367,560 regional jobs. (R. at 66.)

The VE testified that if the individual were limited to performing a job in a seated position for less than one hour in an eight-hour day; performing a standing or walking job for less than one hour in an eight-hour day; could not lift or carry any weight; and, would miss three days of work per month, it would preclude all employment.  (R. at 67.)

When examined by Plaintiff's counsel, the VE responded that if an individual needed unscheduled breaks to rest for 15 minutes after every hour of work, and additionally would need

to elevate both legs to waist level throughout the workday, she would be precluded from all work (R. at 68.)

### III.    MEDICAL RECORDS

**A.    Mandel Haas, M.D.**

Primary care physician, Dr. Haas, began treating Plaintiff in March 2001.  (R. at 421.) Plaintiff was involved in a car accident on March 14, 2004 in which she hit a tree.  (R. at 386-87.)

Objective test results contained in Dr. Haas' treatment record include a January 2006 MRI of the thoracic spine which revealed fairly mild degenerative change, multiple thoracic disc space. There was no evidence of significant disc herniation or spinal stenosis.  (R. at 476.)  A July 5, 2006 pelvic x-ray which revealed sclerosis related to facet arthropathy on the left side at the lumbosacral junction.  (R. at 474.)  A cervical and lumbar myelogram performed on March 2, 2007 showed narrowing of the C5-6 and C6-7-disc spaces with endplate degenerative changes and asymmetry of the S2 nerve root sleeve opacification.  (R. at 472-73.)  A cervical spine CT also taken on March 2, 2007, showed a C5-6-disc bulge and spondylosis mildly deforming the anterior thecal sac, bilateral spurring resulting in deformities of the anterolateral aspect of the thecal sac, and mild narrowing of the bilateral neural foramina.  At C6-7, there is uncovertebral spurring encroaching mildly upon the right neural foramen.  (R. at 469-70.)  Also, on March 7, 2007, a lumbar spine CT showed L4-5 and L5-S1 disc bulges, and L5-S1 facet degenerative changes.  (R. at 468.)  A cervical spine MRI performed on October 3, 2008 showed degenerative disc disease at C5-6 and C6-7 with loss of disc space height, C5-6 moderate bilateral neural

foraminal encroachment, and C6-7 mild bilateral neural foraminal encroachment with uncovertebral facet osteophytes. The radiologist noted no significant change from the prior CT. (R. at 464-65.) Plaintiff also underwent nerve conduction/EMG tests on her left arm and leg between 2004 and 2006 which were normal. (R. at 289, 477, 480, 489.)

During the last year she was insured, Plaintiff saw Dr. Haas on February 6, 2014, and reported to Dr. Haas that her insurance had changed and her pain management provider did not accept it. (R. at 621.) On examination, Dr. Haas found slight asymmetric weakness of hip and arm flexion on the left compared to the right, but he found no difference in deep tendon reflex that he could demonstrate. (R. at 622.) After reviewing Plaintiff's records from pain management, Dr. Haas ordered lumbar and cervical spine MRIs, and prescribed Percocet. (R. at 623.)

On March 5, 2014, Dr. Haas discussed with Plaintiff laboratory results including normal ESR (erythrocyte sedimentation rate, a blood test that detects and monitors inflammation in the body) and muscle enzymes which argued against inflammatory myopathy or process; they also discussed the report from Cleveland Clinic neurology from 2008[1] which notes diagnoses of reflex sympathetic dystrophy and complex regional pain syndrome. Dr. Haas noted that this was the first time that he saw the report as Plaintiff self-referred to Cleveland Clinic. They discussed reflex sympathetic dystrophy and complex regional pain syndrome status post her traumatic injury. Dr. Haas coordinated a referral to pain management based on what Medicaid will allow.

---

[1] The records from Cleveland Clinic dated 2008 are not included in the Certified Administrative Record.

He cancelled his order for MRI imaging as planned at last visit since becoming aware of her reflex sympathetic dystrophy diagnosis. He refilled Plaintiff's prescription for Percocet. (R. at 620.)

On April 2, 2014, Plaintiff reported that the Neurontin helped with the burning, but she still had pain. (R. at 617.) When seen in Dr. Haas' office on May 19, 2014, Plaintiff complained of migraine headaches which are not controlled. The certified nurse practitioner refilled Plaintiff's Topamax medication. (R. at 614-16.)

On examination in December 2014, Dr. Haas found palpable tenderness over the bilateral buttocks, Plaintiff was slow to transfer between positions, and cautious walking gait, but balance was good. (R. at 987.)

Plaintiff continued to treat with Dr. Haas or a medical provider in his practice past her date last insured. (R. at 967-85, 989-1014, 1109-70.)

**B.    Atef Wasef, M.D.**

Plaintiff began treating with pain management specialist, Dr. Wasef on April 7, 2006. (R. at 352.) When seen on October 8, 2010, Plaintiff reported she had undergone nerve block injections, rheumatological workup, neurological workup, and multiple pain medications. On examination, Dr. Wasef found full range of motion of the neck, hyperactive deep tendon reflexes in the ankles and knees and brisk reflexes in the biceps, triceps, and brachialis. Plaintiff received a left C7-T1 cervical epidural steroid injection along with a prescription for Percocet. (R. at 267-68.)

On December 6, 2011, Plaintiff reported symptoms of worsening chronic widespread body pain and difficulty sleeping at night. (R. at 260.) Dr. Wasef found tenderness throughout the cervical, thoracic, and lumbar spine on examination. (*Id.*) Dr. Wasef diagnosed fibromyalgia and performed a left C7-T1 epidural injection. (R. at 266.) Plaintiff returned on April 1, 2011, reporting that the injection had reduced her pain only for two weeks. (R. at 263.) Dr. Wasef prescribed Percocet and Topamax. (*Id.*) Dr. Wasef repeated the C7-T1 epidural injections on June 27, 2011 and August 9, 2011. (R. at 261-62.)

Dr. Wasef continued to prescribed various medications through 2012-2013, including Percocet, Fentanyl patches, Lyrica, Flexeril, and Diclofenac. (R. at 560-73, 580-604.)

On February 7, 2013, Dr. Wasef reported Plaintiff's physical examination generally showed no weakness of all extremities; generalized tenderness over her trunk; deep tendon reflexes were intact all over upper and lower extremities; range of motion of neck, shoulders, lower back all within normal limits. (R. at 591.) Dr. Wasef opined that Plaintiff's generalized chronic body pain could stem from one of several possible diagnoses, including fibromyalgia, endocrine problems like thyroid, psychogenic pain, or hyperalgesia from narcotics. (*Id.*)

On August 27, 2013, Plaintiff told Dr. Wasef that she was in a lot of pain and gave a pain score of 9 out of 10. Dr. Wasef indicated that Plaintiff did not objectively look to have severe pain to be a 9 out of 10. (*Id.*) On examination, he noted that, other than mild scattered tenderness, Plaintiff did not have any remarkable findings. (R. at 562.) Although Plaintiff had told Dr. Wasef at her last appointment that the Percocet was not helping, she reported this time that she did not realize how much it was helping her. Dr. Wasef initiated Percocet again, but at a

lower amount per month due to a concern about opioid therapy addiction.  (*Id.*)  He told Plaintiff that she needed a chronic pain rehab program and suggested Cleveland Clinic.  (*Id*.)  Plaintiff, however, indicated that she was not interested in participating in chronic pain rehab and requested an increased dose of Percocet.  (R. at 560.)

**C.**     **Jose Casanova, M.D., Ph.D.**

Plaintiff consulted with neurologist, Dr. Casanova on November 27, 2012 for evaluation of her chronic daily headaches.  Plaintiff reported suffering from "severe headaches for the past four to five years."  (R. at 512.)  Following examination, Dr. Casanova diagnosed intractable migraine without aura and prescribed Topamax and Imitrex.  (R. at 513-14.)  When Plaintiff returned on March 4, 2013, Dr. Casanova reported that Plaintiff's "headaches have improved significantly."  She told Dr. Casanova she was having one headache per week on Topamax and Imitrex.  (R. at 507.)  Dr. Casanova continued Plaintiff's Topamax and Imitrex.  (R. at 509.)  By September 9, 2013, Plaintiff reported that her headaches were "quite frequent and severe" and accompanied by daily cervical pain, involving mainly the trapezius and the splenius capitis muscles. At times, the cervical pain radiates to the occipital region and trigger a full-blown migraine headache. She any a focal weakness or numbness.  (R. at 504.)  Dr. Casanova increased the dosage of Plaintiff's Topamax, prescribed a Medrol Dosepak, and refilled Imitrex.  (R. at 505-06.)  Dr. Casanova continued to treat Plaintiff after her date last insured.  (1048-79, 1099-1108.)

**D.      John W. Hill, M.D.**

Plaintiff began treating with pain management specialist, Dr. Hill on April 17, 2014 with complaints of burning pain in her neck, left arm, low back, and both legs.  (R. at 710.)  On examination, Dr. Hill found She has 2+ reflexes at the brachials, 4+ at the patellas, and 2+ at the Achilles.  Sensation is grossly intact to the right and left upper and lower extremities.  No allodynia was noted; 5/5 strength to the right and left upper and lower extremities.  She can easily squat and arise without difficulty.  She has good range of motion of the cervical and lumbar spine without significant complaints of pain.  Negative straight leg raise test.  (R. at 711.)  Dr. Hill assessed cervical degenerative disk disease, and radiculitis, with mostly complaints of pain and numbness and tingling down the left arm; and lumbar degenerative disk disease, spondylosis, and radiculltis with bilateral leg pain.  (*Id.*)  He prescribed Neurontin and Cymbalta.  (*Id.*)  Dr. Hill administered a series of three lumbar epidural steroid injections in May 2014.  (R. at 713-21.)  A nerve conduction study performed on May 22, 2014, showed "somewhat subtle electrophysiologic evidence of an old left predominantly L4 radiculopathy without evidence of active denervation."  (R. at 717-18.)

**E.      Roya Vakili, M.D.**

Plaintiff initially consulted with neurologist, Dr. Vakili at the Cleveland Clinic on July 16, 2014 with the complaints of left side pain, number and tingling.  (R. at 914.)  On examination, Dr. Vakili found Plaintiff was not in acute distress; extremities were normal, with no edema. She exhibited normal strength. Neurologically, Plaintiff was fully alert; no muscle weakness was noted.  She found Plaintiff's gait to be normal.  After examining Plaintiff, Dr.

Vakili found that, based on her history of the motor vehicle accident in 2004 with injury to left side, her history of paresthesia and pain, her decreased functional use of left side are consistent with Complex Regional Pain Syndrome (CRPS), along with her history of migraines, neck pain and back pain. Dr. Vakili referred Plaintiff to pain management, increased her dose of Gabapentin, ordered MRIs of her cervical spine and lumbar spine. (R. at 914-25.)

Cervical and lumbar spine MRIs taken on August 20, 2014 showed multilevel degenerative disc disease causing right C3-4, C5-6, and C6-7 severe foraminal narrowing, and multilevel degenerative disc disease causing mild-moderate neural foraminal narrowing at L5-S1. (R. at 926-29.)

When Plaintiff returned on August 25, 2014, Plaintiff reported her pain affects her daily functioning at home and outside, even with the higher dosage of Gabapentin. (R. at 935.) Dr. Vakili reviewed the MRIs and increased Plaintiff's dosage of Neurontin, recommended massage therapy, and ordered a brain MRI. (R. at 938.) That MRI, performed on October 16, 2014, revealed two punctate nonspecific T2 pronation foci in the left frontal lobe. (R. at 940-41.)

Dr. Vakili completed a Spinal Impairment Questionnaire on January 8, 2015, in which she listed Plaintiff's conditions as traumatic brain injury, thalamic pain syndrome, cervical spondylosis, and back pain/degenerative disc disease. (R. at 944.) Dr. Vakili based her diagnoses on the abnormal results of Plaintiff's lumbar, cervical, and brain MRIs. Clinical evidence to support her diagnoses included decreased range of motion in the spine and joints, tenderness, generalized spasms in the legs and arms, left greater than right sensory loss, brisk reflexes, distal upper and lower extremity muscle atrophy, muscle weakness, distal leg motor

loss, positive trigger points in the legs, and balance problems. (R. at 945.) Plaintiff's primary symptoms were very intense left-greater-than-right pain in the arms, legs, face, hips, and other areas. (R. at 944.) Dr. Vakili stated that Plaintiff had muscle weakness in her hand and falls. (R. at 945.) In addition to medications, Dr. Vakili noted that Plaintiff had been treated with physical and occupational therapy. (R. at 946.)

As to Plaintiff's functional abilities, Dr. Vakili opined that in an 8-hour workday Plaintiff could sit less than one hour, stand/walk less than one-hour total, and she must get up every 15 minutes when sitting and move around for 15 minutes. (R. at 946-47.) She added that it was medically necessary for Plaintiff to elevate her legs while seated to the waist level or six inches. (*Id*.) She could never or rarely lift/carry 5 pounds. (R. at 947.) Dr. Vakili responded affirmatively when asked if Plaintiff would have "significant limitations in reaching, handling, or fingering." (R. at 948.) Plaintiff could never/rarely use the bilateral upper extremities to grasp, turn, and twist objects, use the hands/fingers for fine manipulations, or use the arms for reaching (including overhead). (R. at 948.) Dr. Vakili also responded that Plaintiff's symptoms were frequently severe enough to interfere with her attention and concentration. *Id.* She would need to take unscheduled breaks to rest a few times per hour during an 8-hour workday, each break lasting an average of 15 minutes before returning to work. (*Id.*) Plaintiff was likely to be absent from work more than three times a month. (R. at 949.)

**F.      State Agency Review**

In June 2014, after review of Plaintiff's medical record, William Bolz, M.D., opined that

Plaintiff could lift ten pounds frequently and twenty pounds occasionally; stand/walk for about

six hours out of eight, and sit for six hours out of eight.  (R. at 75.)  Dr. Bolz also found Plaintiff

could frequently climb ramps/stairs, balance, stoop, kneel, crouch, and crawl; and occasionally

climb ladders, ropes, or scaffolds.  (R. at 76.)  Dr. Bolz explained that his residual functional

capacity findings are based on Plaintiff's chronic pain. Past imaging reveals some lumbar and

cervical degeneration. Her symptoms are consistent with neuropathic pain, strength gait and

range of motion are limited by pain for which she has been receiving pain management and

injections for and has been prescribed Neurontin and Percocet.  (*Id.*)  In December 2014, Anton

Freihofner, M.D., reviewed the record upon reconsideration and affirmed Dr. Bolz's opinion.

(R. at 87-88.)

## IV.    ADMINISTRATIVE DECISION

On March 22, 2016, the ALJ issued his decision.  (R. at 12-23.)  The ALJ found that

Plaintiff last met the insured status requirements of the Social Security Act on December 31,

2014.  (R. at 14.)  At step one of the sequential evaluation process,[2] the ALJ found that Plaintiff

---

[2] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.  *See* 20 C.F.R. § 404.1520(a)(4).  Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:
    1.      Is the claimant engaged in substantial gainful activity?
    2.      Does the claimant suffer from one or more severe impairments?
    3.      Do the claimant's severe impairments, alone or in combination, meet or

had not engaged in substantially gainful during the period from her alleged onset date of April 1, 2011 through her date last insured of December 31, 2014. (*Id.*) The ALJ found that through the date last insured, Plaintiff had the following severe impairments: degenerative disc disease of the cervical spine, narrowing of C3-4, C5-6 and C6-7 without canal compromise; degenerative disc disease of the lumbar spine L5-Sl, with mild to moderate narrowing without significant canal compromise; migraine headaches without aura. (*Id.*) He further found that through the date last insured, Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 15.) At step four of the sequential process, the ALJ set forth Plaintiff's RFC as follows:

> After careful consideration of the entire record, the [ALJ] finds that, for the period beginning April 1, 2011, and ending on December 31, 2014, the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except climbing ladders, ropes or scaffolds only occasionally.

(R. at 16.) In reaching his conclusions regarding Plaintiff's RFC, the ALJ assigned "little" weight to the opinion from neurologist Dr. Vakili, determining that Dr. Vakili's opinions

---

<p style="margin-left:2em">equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?</p>

4.  Considering the claimant's residual functional capacity, can the claimant perform his or past relevant work?

5.  Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

conflicted with her own examination findings from August 2014, as well as the examination findings from treating pain management specialist Dr. Wasef. (R. at 20.) The ALJ gave "great weight" to the opinions from the state agency medical consultants. (R. at 21.)

Relying on the VE's testimony, the ALJ next found that Plaintiff's limitations preclude her ability to do past relevant work. The ALJ concluded that through the date last insured, Plaintiff could perform other jobs that exist in significant numbers in the national economy. (R. at 22-23.) He therefore concluded that Plaintiff was not disabled under the Social Security Act. (R. at 23.)

## V.    STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial

evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VI.     ANALYSIS

In her Statement of Errors, Plaintiff contends that the ALJ failed to properly weigh the medical opinion evidence, specifically arguing that the ALJ cannot give greater weight to the opinions from non-treating, non-examining, consultants who review an undeveloped medical record over the well-supported opinions from a treating board-certified specialist. Plaintiff next argues that the ALJ failed to properly evaluate her testimony. (ECF No. 7). The Court discusses each of these contentions of error in turn.

## A.     Treating Physician

The ALJ must consider all medical opinions that he or she receives in evaluating a claimant's case. 20 C.F.R. § 416.927(c). The applicable regulations define medical opinions as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 416.927(a)(2).

The ALJ generally gives deference to the opinions of a treating source "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical filings alone . . ." 20 C.F.R. § 416.927(c)(2); *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013); *Blakley*, 581 F.3d at 408.[3] If the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record, [the ALJ] will give it controlling weight." 20 C.F.R. § 404.1527(c)(2).

If the ALJ does not afford controlling weight to a treating physician's opinion, the ALJ must meet certain procedural requirements. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). Specifically, if an ALJ does not give a treating source's opinion controlling weight:

> [A]n ALJ must apply certain factors—namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source—in determining what weight to give the opinion.

*Id*. Furthermore, an ALJ must "always give good reasons in [the ALJ's] notice of determination or decision for the weight [the ALJ] give[s] your treating source's opinion." 20 C.F.R. § 416.927(c)(2). Accordingly, the ALJ's reasoning "must be sufficiently specific to make clear to

---

[3] "Revisions to regulations regarding the evaluation of medical evidence went into effect on March 27, 2017, and purport to apply to the evaluation of opinion evidence for claims filed before March 27, 2017." *Smith v. Comm'r of Soc. Sec.*, No. 3:18CV622, 2019 WL 764792, at *5 n.2. (N.D. Ohio Feb. 21, 2019) (citing 82 Fed. Reg. 5844-5884 (Jan. 18, 2017)). Plaintiff's claim was filed before March 27, 2017, before the new regulations took effect.

any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550 (6th Cir. 2010) (internal quotation omitted). The United States Court of Appeals for the Sixth Circuit has stressed the importance of the good-reason requirement:

> "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases," particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule. *See Halloran v. Barnhart*, 362 F.3d 28, 32–33 (2d Cir. 2004).

*Wilson*, 378 F.3d at 544–45. Thus, the reason-giving requirement is "particularly important when the treating physician has diagnosed the claimant as disabled." *Germany-Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (citing *Rogers*, 486 F.3d at 242). There is no requirement, however, that the ALJ "expressly" consider each of the *Wilson* factors within the written decision. *See Tilley v. Comm'r of Soc. Sec.*, 394 F. App'x 216, 222 (6th Cir. 2010) (indicating that, under *Blakley* and the good reason rule, an ALJ is not required to explicitly address all of the six factors within 20 C.F.R. § 404.1527(c)(2) for weighing medical opinion evidence within the written decision).

Finally, the Commissioner reserves the power to decide certain issues, such as a claimant's residual functional capacity. 20 C.F.R. § 404.1527(d). Although the ALJ will consider opinions of treating physicians "on the nature and severity of your impairment(s)," opinions on issues reserved to the Commissioner are generally not entitled to special significance. 20 C.F.R. § 404.1527(d); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007).

Here, Plaintiff contends that, despite these rules, the ALJ rejected the opinions from "treating board-certified neurologist Dr. Vakili." (Pl's Brif at p. 13.) Plaintiff insists that the ALJ improperly relied on the opinions of non-examining state agency medical consultants. (*Id.* at 14.) She maintains that conflicting substantial evidence "must consist of more than the medical opinions of the nontreating an nonexamining doctors. Otherwise the treating-physician rule would have no practical force . . . ." (*Id.*, *quoting Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 377 (6th Cir. 2013).) The ALJ did indeed afford Dr. Vakili's opinions little weight:

> The Administrative Law Judge has considered the opinions of Dr. Vakili, including that the claimant would be unable to sustain work for eight-hours a day or lift and carry five pounds more than rarely in a workday, but has given them little weight in this decision. Dr. Vakili's opinions are inconsistent with the examinations and observations of Dr. Wasef, as well as his [sic] own reports. Dr. Vakili's August 2014 examination was basically unremarkable. The claimant's mental status, cranial nerves and motor strength were unremarkable and her gait was described as "normal." On examination with Dr. Wasef, the claimant denied "any weakness." Straight leg raises were negative and she demonstrated full cervical and lumbar range of motion.

(R. at 20.)

Plaintiff's contentions of error with respect to the ALJ's treatment of the opinion evidence fail here. As set forth above, to qualify as a treating source, the physician must have an "ongoing treatment relationship" with the claimant. 20 C.F.R. § 404.1502. A Court must determine whether or not an ongoing treatment relationship exists at the time the physician's opinion is rendered. *Kornecky v. Comm'r of Soc. Sec.*, No. 04-2171, 167 F. App'x 496, 506 (6th Cir. Feb. 9, 2006) ("[T]he relevant inquiry is . . . whether [claimant] had the ongoing relationship with [the physician] *at the time he rendered his opinion*. [V]isits to [the physician] *after* his RFC assessment could not retroactively render him a treating physician at the time of

the assessment."); *see also Yamin v. Comm'r of Soc. Sec.*, 67 F. App'x 883, 885 (6th Cir. 2003) ("These two examinations did not give [the physician] a long term overview of [the claimant's] condition."); *Anderson v. Comm'r of Soc. Sec.*, No. 3:16-cv-114, 2017 WL 4070606 at *3 (S.D. Ohio Sept. 12, 2017 (holding physician who only saw plaintiff twice not a treating physician). This is because "the rationale of the treating physician doctrine simply does not apply" where a physician issues an opinion after a single examination. *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994).

Here, Dr. Vakili examined Plaintiff twice, once on July 16, 2014 and again on August 25, 2014. (R. at 914, 935.) These two examinations simply did not give Dr. Vakili a long-term overview of Plaintiff's condition. *Yamin*, 67 F. App'x at 885; *Anderson*, 2017 WL 4070606 at *3. Therefore, Plaintiff's assertion that the ALJ erred by not affording controlling weight to the opinions of Dr. Vakili is misplaced. *See* SSR 96-2, 1996 WL 374188 at *1 (controlling weight may be given only to medical opinions of treating sources).

Plaintiff maintains that the ALJ erred by giving greater weight to the opinions of the state agency doctors, William Bolz, M.D. and Anton Freihofner, M.D., than to the opinion of Dr. Vakili. The ALJ permissibly relied on the state agency doctors' opinions in formulating Plaintiff's RFC. Both Drs. Bolz and Freihofner opined that Plaintiff could perform tasks consistent with the requirements of light work. (R. at 446-49, 462-65.) Under the regulations:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.

20 C.F.R. § 404.1567(b)).

State agency doctors are "highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation." 20 C.F.R. § 404.1527(e)(2)(i). The fact that the state agency doctors did not have access to Dr. Valiki's assessment or the testimony from the hearing does not inevitably render their opinions invalid.

In this case, the state agency doctors opined about Plaintiff's ability to work during the period she claims she was disabled. The ALJ considered the record as a whole, including records that were submitted after the state agency physicians arrived at their conclusions, and properly found that the state agency doctors' opinions were consistent with the entire record. (R. at 21.)

The ALJ properly weighed the opinion evidence in this case. He accurately detailed Plaintiff's treatment history relating to her back impairments and her migraines. Specifically, the ALJ referenced Plaintiff's multiple unremarkable physical examinations ranging in time between July 2010 and December 2014 which indicated that she had normal gait and station, as observed by Drs. Casanova, Haas, Hill, Rosenquist, and Vakili (R. at 18, 19, 21, 509, 514, 622, 647, 665, 802, 867, 899, 987); intact/normal cranial nerves, as observed by Drs. Casanova and Vakili (R. at 19-21, 507-08, 513-14, 665, 899, 936); normal motor strength and tone, as observed by Drs. Casanova, Rosenquist, Vakili, and Wasef (R. at 18-21, 509, 514, 566, 665, 867, 899); negative straight leg raises, as observed by Drs. Hill, Takla, and Wasef (R. at 17, 20, 251, 258, 260, 560, 564, 572, 580, 595, 601, 647); and full neck and/or lower back range of motion, as observed by Drs. Haas, Takla, and Wasef (R. at 17, 18, 251, 253, 258, 260, 267, 270, 560, 564, 572, 595, 598, 802.)

Additionally, the ALJ reasonably relied on the fact that Plaintiff's diagnostic studies showed few abnormalities. (R. at 21.) Multiple diagnostic tests, including EMGs, MRIs, and CT scans, indicated normal results or only mild dysfunction. For example, EMGs performed from 2004 through 2008 were all normal, which Dr. Wasef subsequently characterized as negative for radiculopathy. (R. at 289, 477, 480, 489.) Dr. Vakili also characterized an EMG in May 2014 as normal. (R. at 718, 881.) Cervical spine MRIs performed in 2005 and 2008 showed only mild degenerative changes, and mild disc bulges without significant spinal stenosis, respectively (R. at 464, 479); a lumbar spine MRI performed in 2004 was normal (R. at 495); and a 2006 thoracic spine MRI showed "fairly mild" degenerative changes. (R. at 478.) CT scans in 2007 also showed only mild or minimal abnormalities in Plaintiff's neck and back. (R. at 245, 468, 470.) This evidence is substantial and supports the ALJ's conclusion that Plaintiff was not disabled during the relevant period.

The ALJ complied with the relevant regulations when affording great weight to the state agency medical reviewers, who both opined that the Plaintiff was limited to lifting/carrying twenty pounds occasionally and ten pounds frequently, standing/walking for a total of six hours per eight-hour workday, and sitting for six hours per eight-hour workday, along with the postural limitation of climbing ladders/ropes/scaffolds occasionally (R. at 75-76, 87-88). As noted by the ALJ, the state agency medical reviewers' opinions were consistent each other, as well as with the objective medical evidence (R. at 21.) *See* 20 C.F.R. § 404.1527(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion."); *Abel v. Comm'r of Soc. Sec.*, No. 1:14-CV-699, 2015 WL 4755204, at *13 (S.D. Ohio Aug. 11, 2015) (upholding the ALJ's RFC determination, noting that both

state agency physicians concluded the plaintiff was capable of sedentary work.)  Plaintiff's medical history, including physical examinations revealing her normal gait and station, intact/normal cranial nerves, normal motor strength and tone, negative straight leg raises and full neck and lower back range of motion; as well as her many MRIs, CTs, and EMGs showing only minimal abnormalities, is consistent with and provides substantial support for Dr. Bolz and Dr. Freihofner's determinations regarding Plaintiff's physical limitations.

As detailed in his decision, the ALJ found that Dr. Vakili's opinion was inconsistent with Dr. Wasef's examinations and observations.  (R. at 21.)  Inconsistency with the record is a reasonable basis upon which an ALJ may discount a medical opinion.  *See* 20 C.F.R. § 404.1527(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion."); *Abel,* 2015 WL 4755204, at *13.  The ALJ referred to normal testing results, which include ten separate examinations between December 2011 and December 2013, during which Dr. Wasef observed that Plaintiff had full low back and/or neck range of motion and negative straight leg raises.  (R. at 21, 580-83, 586, 593-606.)  The ALJ also noted the multiple times Dr. Wasef documented Plaintiff's denials of weakness in her arms and legs.  (R. at 21, 582, 597-599, 601, 603, 605.)  The ALJ also noted Dr. Wasef's observation during an August 2013 examination in which Plaintiff rated her pain as 9/10, that she "objectively [did] not look to have severe pain to be a 9/10" and that "[o]ther than mild scattered tenderness, [she did] not have any remarkable findings . . . ."  (R. at 18, 584.)

Substantial evidence supports the ALJ's determination that Dr. Vakili's opinion was inconsistent with her own treatment records.  In particular, the ALJ pointed to Dr. Vakili's August 2014 examination of Plaintiff, during which she noted no irregularities with Plaintiff's

cranial nerves, mental status, and motor strength, and documented Plaintiff's normal gait. (R. at 21, 936.) *See Bledsoe v. Barnhart,* 165 F. App'x 408, 412 (6th Cir. 2006) (ALJ's statement that a treating physician's opinion was "not well supported by the overall evidence of record and [was] inconsistent with the other medical evidence of record" was adequate and sufficiently specific).

Plaintiff suggests that it was improper for the ALJ to assign little weight to Dr. Vakili's opinion and contends that the only conflicting evidence was the contradictory opinions of the state agency reviewing physicians. (Pl's Br. 14-15.) As detailed above, however, the ALJ pointed to a wide range of additional evidence that undermines Dr. Vakili's opinion, including her own treatment notes and the treatment notes from treating physician Dr. Wasef.

Plaintiff emphasizes countervailing evidence in the record and faults the ALJ for his purported lack of attention to it. The ALJ, however, considered the countervailing evidence and explicitly discussed much of the evidence Plaintiff relies on. For instance, the ALJ considered the August 2014 cervical and lumbar MRIs; Plaintiff's complaints of tenderness throughout her spine, and buttocks; a December 2014 exam indicating that Plaintiff was slow to transfer and that her walking was cautious; and Plaintiff's reports of increased sensitivity on her left side. The ALJ nevertheless reasonably exercised his discretion in finding that the overall record did not support the extreme limitations opined by Dr. Vakili. (R. at 17, 19, 260, 874, 882, 987.) Moreover, the mere fact that countervailing evidence exists does not undercut the ALJ's decision, so long as it is supported by substantial evidence. *Longworth v. Comm'r of Soc. Sec*, 402 F.3d 591, 595 (6th Cir. 2005) ("If substantial evidence supports the Commissioner's decision, this Court will defer to that finding even if there is substantial evidence in the record

that would have supported an opposite conclusion.").

It is therefore **RECOMMENDED** that Plaintiff's first contention of error be

**OVERRULED**.

**B.    Plaintiff's Subjective Allegations**

The Sixth Circuit has provided the following guidance in considering an ALJ's

credibility assessment:[4]

> Where the symptoms and not the underlying condition form the basis of the disability claim, a two-part analysis is used in evaluating complaints of disabling pain. 20 C.F.R. § 416.929(a); *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001); *Felisky v. Bowen*, 35 F.3d 1027, 1038-39 (6th Cir. 1994).  First, the ALJ will ask whether the there is an underlying medically determinable physical impairment that could reasonably be expected to produce the claimant's symptoms. 20 C.F.R. § 416.929(a). Second, if the ALJ finds that such an impairment exists, then he must evaluate the intensity, persistence, and limiting effects of the symptoms on the individual's ability to do basic work activities.  *Id.*

*Rogers*, 486 F.3d at 247.

"The ALJ's assessment of credibility is entitled to great weight and deference."

*Infantado v. Astrue*, 263 F. App'x 469, 475 (6th Cir. 2008) (citing *Walters v.  Comm'r of Soc.*

*Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)); *Sullenger v. Comm'r of Soc. Sec.*, 255 F. App'x 988,

995 (6th Cir. 2007) (declining to disturb the ALJ's credibility determination, stating that "[w]e

will not try the case anew, resolve conflicts in the evidence, or decide questions of credibility"

(citation omitted)).  This deference extends to an ALJ's credibility determinations "with respect

---

[4] An ALJ's consideration of a claimant's statements about symptoms and limitations, generally known as credibility analysis, is required.  But, as clarified by SSR 16-3p (applicable as of March 28, 2016), the focus is not on the claimant's propensity for truthfulness or character but rather on the consistency of her statements about the intensity, persistence, and limiting effects of symptoms with the relevant evidence.  *See* SSR 16-3p, 2017 WL 5180304 at *2, *6, *11.  Consequently, the Court uses the term "credibility" in the context the consistency of Plaintiff's statements about her symptoms with the evidence in the record.

to [a claimant's] subjective complaints of pain." *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 652

(6th Cir. 2009) (quoting *Siterlet v. Sec'y of Health & Hum. Servs.*, 823 F.2d 918, 920 (6th Cir.

1987)).  Despite this deference, "an ALJ's assessment of a claimant's credibility must be

supported by substantial evidence." *Walters*, 127 F.3d at 531.  Furthermore, the ALJ's decision

on credibility must be "based on a consideration of the entire record." *Rogers*, 486 F.3d at 247

(internal quotation omitted).  An ALJ's explanation of his or her credibility decision "must be

sufficiently specific to make clear to the individual and to any subsequent reviewers the weight

the adjudicator gave to the individual's statements and the reasons for that weight." *Id.* at 248;

*see also Mason v. Comm'r of Soc. Sec. Admin.*, No. 1:06–CV–1566, 2012 WL 669930, at *10

(N.D. Ohio Feb. 29, 2012) ("While the ALJ's credibility findings 'must be sufficiently specific',

*Rogers*, 486 F.3d at 248, the intent behind this standard is to ensure meaningful appellate

review.").

"Discounting credibility to a certain degree is appropriate where an ALJ finds

contradictions among the medical reports, claimant's testimony, and other evidence." *Walters*,

127 F.3d at 531.  In addition, the Regulations list a variety of factors an ALJ must consider in

evaluating the severity of symptoms, including a claimant's daily activities; the effectiveness of

medication; and treatment other than medication.  20 C.F.R. § 404.1529(c)(3); SSR 96–7p, 1996

WL 374186 (July 2, 1996); *but see Ewing v. Astrue*, No. 1:10–cv–1792, 2011 WL 3843692, at

*9 (N.D. Ohio Aug. 12, 2011) (suggesting that although an ALJ is required to consider such

factors, he or she is not required to discuss every factor within the written decision) (Report and

Recommendation later adopted).

Plaintiff underscores the fact that the ALJ acknowledged Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." Plaintiffs argues, however, that the ALJ impermissibly used boilerplate language when he found her statements concerning the intensity, persistence, and limiting effects of her symptoms "not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (Pl's Brief at p. 19, quoting R. at 21.) Plaintiff insists that ALJ's conclusory finding that her statements are "not entirely consistent" with the record is not sufficient under the Commissioner's Regulations and Ruling, which require the ALJ to evaluate a claimant's subjective statements under a number of factors. The undersigned disagrees and concludes that the ALJ properly evaluated Plaintiff's allegations consistent with the regulations. Here the ALJ's decision contains a robust review of the many examinations, studies, reports, and statements by Plaintiff that support his determination that Plaintiff's statements were not entirely consistent with the record as a whole.

The ALJ summarized his credibility determination as follows:

The medical evidence of record shows that the claimant's impairments for the period beginning April 1, 2011, and ending on December 31, 2014, did not preclude the claimant from performing a range of light work. Her diagnostic studies showed few abnormalities and her examinations as basically unremarkable. The claimant's treatment records during the relevant period indicate some pain, but very little dysfunction. Her gait and station were consistently described as normal. The claimant's cranial nerves were intact and her motor strength and tone were within normal limits. Although the claimant reported occasional migraines, the record shows that treatment and follow up were successful in resolving her headaches' severity and frequency.

(R. at 21.)

The ALJ found that Plaintiff's unremarkable physical examinations and diagnostic studies, her testimony regarding her physical capabilities following her accident, and evidence regarding the efficacy of her medical treatment collectively undermine her allegations of disabling limitations. Substantial evidence supports this conclusion. (R. at 289, 477, 480 & 489 (nerve conduction/EMG tests on left arm and leg between 2004 and 2006 were normal); 507 ("Patient doing well. Her headaches have improved significantly."), 580-83 (full lumbar range of motion; "Dr. Wasef had suggested her going to the Cleveland Clinic for the chronic pain lab; however, she is not interested.")) The ALJ properly considered this evidence in evaluating Plaintiff's subjective complaints. *See* 20 C.F.R. § 404.1529(c)(1) ("In evaluating the intensity and persistence of your symptoms, we consider all of the available evidence from your medical sources and nonmedical sources about how your symptoms affect you.").

The ALJ contrasted Plaintiff's statements with the objective medical evidence. He referenced Plaintiff's many unremarkable examinations and diagnostic studies. Specifically, the ALJ highlighted the many records that indicate Plaintiff's normal gait and station, her intact cranial nerves, and her normal motor strength and tone. The ALJ applied the other relevant factors in assessing Plaintiff's claims. He noted that Plaintiff's migraine treatments were successful in reducing their severity and frequency, as evidenced by Dr. Casanova's comment in November 2012 that Imitrex was "working well," and his later observation in March 2013 that her headaches had "improved significantly," and that Plaintiff was only experiencing roughly one headache a week. (R. at 21, 507, 514.) These are proper considerations in assessing credibility. *See Smith v. Comm'r of Soc. Sec. Admin.*, 564 F. App'x 758, 763 (6th Cir. 2014) ("Disability is not supported when an individual's impairments are improved with treatment.").

The ALJ also properly considered the fact that Plaintiff returned to work following her 2004 accident. Plaintiff reported that she returned to work roughly six months post-accident and continued to work until 2009. (R. at 48, 402.) She further testified that she stopped working due to a layoff and not her medical conditions and received unemployment benefits for one to two years. (R. at 48.)

The medical record establishes that Plaintiff's conditions have remained largely stable and unchanged from the time of her accident through the relevant period. By way of example, Plaintiff reported extreme pain between 2006 and 2009, including 9/10 back pain and 10/10 leg pain in early 2006, and 10/10 overall pain in 2008, but was still able to work as a wax pattern assembler. (R. at 406-407, 692.) Plaintiff reported multiple times in 2011 to 2014 back pain of 8/10 and 7/10, suggested comparable levels of discomfort, and even periods of diminished pain as compared to her earlier reports when she was able to work. (*See e.g.*, R. at 258, 260, 572, 587.) The fact that her conditions did not materially worsened after 2009 suggests that she remained capable of working, and thus undermines her claim of disability. *See* 20 C.F.R. § 404.1529(c) ("We will consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between your statements and the rest of the evidence, including your history . . . about how your symptoms affect you."); Social Security Ruling 16-3p, 2017 WL 5180304 at *7-8.

In sum, substantial evidence supports the ALJ's credibility assessment. The ALJ reasonably considered the factors under § 404.1529(c)(3) in determining that Plaintiff's subjective complaints of pain were not as severe as she alleged. The undersigned finds no

compelling reason for the Court to disturb the ALJ's credibility determination.   For these reasons, it is **RECOMMENDED** that Plaintiff's second contention of error be **OVERRULED**.

## VII.   CONCLUSION

From a review of the record as a whole, the Undersigned concludes that substantial evidence supports the ALJ's decision denying benefits.  Accordingly, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner of Social Security's decision.

## VIII.   PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court.  *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that

defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation).  Even when timely objections are filed, appellate review of issues not raised in those objections is waived.  *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

Date:  January 23, 2020

_____/s/ *Elizabeth A. Preston Deavers*
Elizabeth A. Preston Deavers
Chief United States Magistrate Judge